Matthew N. Evans (USB # 7051)
Eric G. Benson (USB # 10414)
Z. Ryan Pahnke (USB # 11146)
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Facsimile: (801) 532-7543
Email:  mevans@rqn.com
        ebenson@rqn.com
        rpahnke@rqn.com

*Attorneys for Plaintiff, NorthStar Alarm Services, LLC*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DIVISION, UTAH

| | |
|---|---|
| NORTHSTAR ALARM SERVICES, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> ALDER HOME PROTECTION, doing business as ALDER HOLDINGS, LLC, a Utah Limited Liability Corporation. <br><br> Defendant. | **AMENDED COMPLAINT** <br><br><br> Case No. 2:17-cv-1097-DN <br><br> Judge David Nuffer |

NorthStar Alarm Services, LLC ("NorthStar"), by and through its undersigned counsel, hereby submits its Amended Complaint against Alder Holdings Home Protection, doing business as Alder Holdings, LLC ("Alder") or ("Defendant"), and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      NorthStar is a Utah limited liability company with its principal place of business in Utah County, Utah.

2.      Alder is a Utah corporation with its principal place of business in Utah County, Utah.

3.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because certain of NorthStar's claims arise under the laws of the United States (including, without limitation, 15 U.S.C. § 1125 *et seq.*).  This Court has supplemental jurisdiction over NorthStar's other claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Alder resides in Utah County, Utah.

## GENERAL ALLEGATIONS

5.      NorthStar is in the business of marketing, installing, and monitoring electronic security systems and related equipment in a number of states throughout the United States. NorthStar's primary sales channel is through direct, door-to-door sales.

6.      NorthStar, which has been in business since 2001, is a recognized leader in the home security market.  It has received national recognition as a full service provider of home security systems and related products and services.

7.      By 2017, NorthStar had an existing customer base of approximately 50,000 residential alarm accounts.

8.      A customer who purchases a home security system from NorthStar also enters into a contract pursuant to which the homeowner pays a monthly monitoring fee to NorthStar for ongoing alarm monitoring services.

9.     NorthStar has expended, and continues to expend, substantial time, money, and resources in acquiring customers, providing ongoing service to its customers, and maintaining relationships with its customers.

10.     Defendant is also in the business of marketing, installing, and monitoring electronic security systems and related equipment in a number of states throughout the United States.

11.     Defendant also engages in door-to-door sales of its products and services, and a substantial number of its customers are acquired through its door-to-door sales operations.

12.     Defendant competes directly with NorthStar in the security systems market, and the two companies provide substantially identical security monitoring services to their respective customers.

13.     NorthStar's customers are located in a number of states throughout the United States.

14.     Defendant has engaged, and continues to engage, in a concerted effort across the country to mislead and deceive existing NorthStar customers in order to cause the customers to switch from NorthStar to Alder, including customers in contractual relationships with NorthStar under false pretenses.

15.     Defendant trains its sale representatives to employ false and deceptive sales practices when conducting door-to-door sales in order to persuade existing NorthStar customers to switch to Alder under false pretenses and misinformation.

16.     Defendant's misconduct includes, among other things, disseminating false, disparaging, and damaging information about NorthStar and its business operations; unfairly

3

competing with NorthStar; and interfering with NorthStar's contractual relationships with its customers.

17.     Defendant targets customers of other security systems companies, including NorthStar, by seeking out dwellings with alarm system signs that customers post on their premises as a deterrence for potential burglars and trespassers.  Defendant then solicits current customers with deceptive sales pitches that are intended to be and are, in fact, misleading by informing NorthStar customers that Defendant represents or is affiliated with NorthStar—or with the companies that make the alarm equipment installed in the customers' homes—that the customer's current alarm system needs to be "upgraded," that Alder is taking over NorthStar's accounts in the area, that NorthStar is going out of business, and/or that Alder will take care of cancelling the customer's existing NorthStar contract.  Defendant uses these sales techniques to induce NorthStar customers to sign Alder contracts and install Alder alarm systems under the pretext of "upgrading" their current NorthStar alarm system.

18.     NorthStar is aware of instances where Defendant has made the following types of intentional misrepresentations to NorthStar's existing customers:

       a.     that an Alder sales representative was a NorthStar representative or was associated with NorthStar;

       b.     that Alder had acquired or otherwise "bought out" NorthStar;

       c.     that NorthStar was no longer in business;

       d.     that Alder had acquired accounts from NorthStar and is taking over servicing the accounts from NorthStar;

       e.     that an Alder sales representative was providing "upgrades" for NorthStar;

4

      f.     that a NorthStar customer's security system was no longer operational and needed to be replaced; and

      g.     that a NorthStar customer's contract with NorthStar had expired, or was invalid.

19.    Defendant's deceptive practices are injuring NorthStar by causing NorthStar's customers to uninstall their NorthStar equipment, execute new contracts for security services with Alder and install Alder equipment, and then terminate their NorthStar contracts.

20.    Defendant, by falsely representing to NorthStar customers that their NorthStar security systems are outdated or somehow vulnerable, or are in need of "upgrades," damage NorthStar's goodwill and reputation as a reliable provider of security services.

21.    As a result of Defendant's practices, a number of NorthStar customers have unwittingly wound up with Alder security systems installed in their homes, and with concurrent contractual obligations to both NorthStar and Alder.  In many instances, customers retain their already installed Alder security systems, and terminated their NorthStar contracts.

22.    Such practices, as alleged in greater detail below, violate statutory and common-law prohibitions against the use of false and deceptive statements in commerce.

23.    Defendant's misconduct has damaged, and continues to damage, NorthStar's reputation, goodwill, existing business relationships, and prospective business relationships.

24.    Throughout 2016 and 2017, NorthStar received numerous calls from its customers reporting visits by Alder sales agents, who expressed confusion as to whether the Alder representatives were affiliated with NorthStar.  These customers have reported Alder's false or misleading sales pitches in Arkansas, Michigan, Missouri, Texas, South Carolina, Alabama and

other states throughout the U.S.  NorthStar offers the following examples to illustrate

Defendant's deceptive and tortious sales tactics, which NorthStar believes to be just the tip of the

iceberg, and those practices continue.

**Instances of Misrepresentations by Alder Sales
Representatives to NorthStar Customers**

25.     On or about August 18, 2017, NorthStar customer, Tollie Hatcher, was

approached at his home in Muskegon, Michigan by a yet to be identified Alder sales

representative.  The Alder representative led Hatcher to believe he there was from NorthStar to

"upgrade" Hatcher's NorthStar alarm system in order to fix a known issue with the system.

Hatcher, however, later learned that the representative was not, in fact, a NorthStar employee,

but was with an entirely different company—Alder.  When Hatcher realized this, the Alder

representative told Hatcher that if he signed a new contract with Alder, Alder would take care of

cancelling Hatcher's contract with NorthStar.  Alder, however, never cancelled Hatcher's

contract with NorthStar.  Hatcher agreed to sign a new contract with Alder based on the

fraudulent misrepresentations.

26.     In or around June 2017, NorthStar customer, John O'Malley, was approached at

his home in Detroit, Michigan by a yet to be identified Alder sales representative.   The Alder

representative told O'Malley that if he signed a new contract with Alder, Alder would take care

of cancelling O'Malley's existing contract with NorthStar.  Alder, however, never cancelled

O'Malley's contract with NorthStar.  O'Malley agreed to sign a new contract with Alder based

on the fraudulent misrepresentations.

27.     On or about May 16, 2017, NorthStar customer, Mary Leach, was approached at

her home in Kilgore, Texas by a yet to be identified Alder sales representative.  The Alder

6

representative told Leach that if she signed a new contract with Alder, Alder would take care of cancelling Leach's existing contract with NorthStar.  Alder, however, never cancelled Leach's contract with NorthStar.  Leach agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

28.      On or about February 10, 2017, NorthStar customer, Caroline Taylor, was approached at her home in Rocky Mount, North Carolina, by a man named Benjamin, who was later determined to be an Alder sales representative.  Benjamin informed Taylor that he was there on behalf of NorthStar and that they were changing the monitoring company for her system.  Based on that information, Taylor allowed Benjamin to enter her home to switch out her security system panel.  Taylor also signed a 60-month agreement with Alder.  Taylor did not realize she had signed up with a completely new company until her credit card bill arrived the following month, and she saw that she been billed by both NorthStar and Alder.  Taylor agreed to sign the new contract with Alder based on Benjamin's fraudulent misrepresentations.

29.      On or about December 14, 2016, NorthStar customer, LaWanda Hill, was approached at her home in Greenville, Texas by a man named Burke Nixon, who was later determined to be an Alder sales representative.  Nixon led Hill to believe he was from NorthStar and stated that he was there to "update" Hill's security system.  Based on that information, Hill allowed Nixon to enter her home to install the updates.  Hill did not realize she had signed up with a completely new company until her credit card bill arrived the following month, and she saw that she been billed by both NorthStar and Alder.  Hill unintentionally signed up with a second home security company, Alder, based on Nixon's fraudulent misrepresentations.

30.     On or about June 16, 2017, NorthStar customer, Raymond Barnes, was approached at his home in Detroit, Michigan by Alder sales representative Jacob Dahl.  Dahl informed Barnes that NorthStar was going out of business and that he was in the area to update all of the accounts to the new provider.  Barnes, who is elderly and was sick at the time, allowed Dahl to enter his home based on those representations.  Barnes did not realize he had signed up with a completely new company until his wife called NorthStar later to verify that Dahl had given them correct information.   Barnes unintentionally signed up with a second home security company, Alder, based on Dahl's fraudulent misrepresentations.

31.     On or about August 11, 2017, NorthStar contacted its customer, Valerie Akins-Gant of Detroit, Michigan, due to an alert that had been transmitted to NorthStar's central server regarding the system panel in Gant's home.  Gant informed NorthStar that the system had alerted because of an upgrade NorthStar had installed in her home.  NorthStar responded, telling Gant that they had no record of scheduling an upgrade for her system and that no records existed showing a NorthStar representative performing such an upgrade to the security system.  Gant informed NorthStar that a representative named Justin Garner, who is an Alder sales representative, had gained entrance to her home by leading her to believe he worked with NorthStar and informing her that an upgrade to her system was necessary.  Gant did not know Garner's true identity, or that he had no affiliation whatsoever with NorthStar, until NorthStar representatives informed her that no one from NorthStar had visited her home to perform a system upgrade.  Gant unintentionally signed up with a second home security company, Alder, based on Garner's fraudulent misrepresentations.

32.     On or about July 15, 2017, NorthStar customer, Janice Kelly, was approached at her home in Inkster, Michigan by Alder sales representative Jacob Dahl.  Dahl informed Kelly that Alder and NorthStar had merged and that he was there to "upgrade" the security panel in her home.   Kelly allowed Dahl to enter her home and install the new system based on Dahl's representations.  Kelly did not realize she had signed up with a completely new company until she saw the following month that she had been billed by two separate companies—NorthStar and Alder.  Kelly unintentionally signed up with a second home security company, Alder, based on Dahl's fraudulent misrepresentations.

33.     On or about June 14, 2017, NorthStar customer, Vincent Day, was approached at his home in Jennings, Missouri by Alder sales representative Jonathan Thomas.  Thomas told Day that Alder had purchased all of the NorthStar accounts in the area and that they were coming to update the panel.  Day allowed Thomas to enter his home and install the new security system based on Thomas' representations.  Thomas also told Day to ignore any bills that NorthStar sent to him because Alder had already taken care of his account for him.  Day later discovered that Alder had not, in fact, cancelled his account with NorthStar and that NorthStar was still in business.  Day unintentionally signed up with a second home security company, Alder, based on Thomas' fraudulent misrepresentations.

34.     On or about August 18, 2017, NorthStar customer, Chael Hall, was approached at his home in Grandview, Missouri by a yet to be identified Alder sales representative.  The Alder representative told Hall that Alder had purchased NorthStar and that his security system needed to be "updated" because the older systems had been causing fires in some customers' homes. The Alder representative showed Hall a picture of a house that had allegedly caught fire in this

9

manner.   Hall unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

35.   On or about May 31, 2017, NorthStar customer, Peter LaRose, was approached at his home in Canton, Michigan by Alder sales representative Jacob Dahl.  Dahl told LaRose that if he signed a new contract with Alder, Alder would take care of cancelling LaRose's existing contract with NorthStar.  Alder, however, never cancelled LaRose's contract with NorthStar. LaRose agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

36.   In or about December 2016, NorthStar customer, Nancy Hamilton, was approached at her home in Greenville, Texas by a yet to be identified Alder sales representative. The Alder sales representative led Hamilton to believe that if she signed a new contract with Alder, Alder would take care of cancelling Hamilton's existing contract with NorthStar.  Alder, however, never cancelled Hamilton's contract with NorthStar.  Hamilton agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

37.   On or about August 8, 2017, NorthStar customer, Linda Perez, was approached at her home in Austin, Texas by a yet to be identified Alder sales representative.  The Alder sales representative told Perez that if she signed a new contract with Alder she could cancel her existing NorthStar account by simply signing a letter presented to her by Alder and, once executed, Alder would then send the letter to NorthStar to cancel the account.  Alder, however, never cancelled Perez's contract with NorthStar.  Perez agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

38.   On or about August 17, 2017, the wife of NorthStar customer Roy Anderson's wife was approached at her home in El Dorado, Arkansas by an Alder sales representative who

identified himself as Sebastian.  Sebastian told Anderson that Alder could upgrade her security system with medical alert features for her husband who suffers from various medical conditions. Sebastian led Anderson to believe that if she signed a new contract with Alder, Alder would cancel Anderson's existing contract with NorthStar.  Alder, however, never cancelled Anderson's contract with NorthStar.  Anderson agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

39.     On or about August 24, 2017, NorthStar customer, Charles Dew, was approached at his home in Monticello, Arkansas by Alder sales representative Marcus Corvis, Jr.  Corvis informed Dew that his security system was out-of-date and needed to be "upgraded."  Believing that Corvis was with NorthStar, Dew allowed Corvis to install the upgrade to the security system.  Dew did not realize he had signed up with a completely new company until later.  Dew unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

40.     On or about August 11, 2017, NorthStar customer, Corinthis Wilson, was approached at his home in Austin, Texas by Alder sales representative Kyle Sockett.  Sockett informed Wilson that his NorthStar account had been cancelled and that obtaining a new Alder security system would save Wilson money.   Contrary to Sockett's claims, Wilson's NorthStar account had not been cancelled and Wilson now had accounts with two home security companies.  Wilson agreed to sign the new contract with Alder based on the fraudulent misrepresentations.

41.     On or about July 3, 2017, NorthStar customer, Virginia McKillip, was approached at her home in Van Buren Charter Township, Michigan by Alder sales representative Jacob Dahl.

Dahl led McKillip to believe he was from NorthStar and told her that he was there to "upgrade" McKillip's security system.  Based on this information, McKillip allowed Dahl to install the updated panel.  McKillip did not realize that she had signed up with a completely new company until she was billed by both NorthStar and Alder the following month.  McKillip unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

42.     On or about June 29, 2017, NorthStar customer, Ronald Johnson, was approached at his home in Hallsville, Texas by Alder sales representative John Habinc.  Habinc told Johnson that Alder had contacted NorthStar on Johnson's behalf and cancelled his NorthStar account.  Alder, however, never cancelled Johnson's contract with NorthStar. Johnson agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

43.     On or about June 15, 2017, NorthStar customer, Marjorie Donze, was approached at her home in Bridgeton, Missouri by Alder sales representative Layeli Muthoka.  Muthoka informed Donze that NorthStar was going out of business and that he was there to have her system changed over to Alder.  Donze did not realize until she was billed by both Alder and NorthStar that NorthStar was not, in fact, going out of business.  Donze unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

44.     On or about August 3, 2017, NorthStar customer, Mary Chaney, was approached at her home in Florissant, Missouri by Alder sales representative Jeremiah Thomas.  Thomas told Chaney that Alder had purchased Chaney's NorthStar account and that Alder would be servicing her account going forward.  Chaney unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

45.     On or about May 1, 2017, NorthStar customer, Wilfred Miller, was approached at her home in St. Louis, Missouri by Alder sales representative Shawn Thompson.  Thompson informed Miller that her home security system was deficient and could be accessed and shut off remotely, and that the security system needed to be updated.  Miller unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

46.     On or about July 1, 2017, NorthStar customer, Clara Williams, was approached at her home in Tuscaloosa, Alabama by Alder sales representative Mike Moncur.  Moncur told Williams that Alder had purchased all of the NorthStar accounts in the area and Alder would be servicing Williams' account going forward.  Alder had not, however, purchased NorthStar accounts in the area nor did they cancel Williams' NorthStar account.  Williams agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

47.     On or about July 13, 2017, the wife of NorthStar customer, Roy Lipsey, was approached at her home in Waco, Texas by Alder sales representative John Elmer.  Elmer informed Lipsey that her agreement with NorthStar had expired and she could now upgrade her security system.  Lipsey's agreement with NorthStar, however, had not expired.  Lipsey unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

48.     On or about June 17, 2017, NorthStar customer, Dan Szuba, was approached at his home in Westland, Michigan by Alder sales representative Justin Garner.  Garner informed Szuba that Alder had purchased all of the NorthStar accounts in the area and Alder would be servicing Szuba's security system—with new equipment at lower rates—going forward.  Szuba did not realize until later that he was being charged by both Alder and NorthStar.  Szuba agreed

to sign a new contract with a second home security company, Alder, based on the fraudulent misrepresentations.

49.     On or about July 1, 2017, NorthStar customer, Eugene Kotrla, was approached at her home in Temple, Texas by a yet to be identified Alder sales representative.  The Alder representative told Kotrla that her agreement with NorthStar had expired, and that Alder had purchased her account and would be charging a lower monthly rate.  Kotrla's agreement with NorthStar, however, had not been purchased by Alder nor had it expired.  Kotrla unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

50.     On or about June 16, 2017, NorthStar customer, Debra Vargo, was approached at her home in Wayne, Michigan by Alder sales representative Justin Garner.  Garner informed Vargo that Alder had purchased Vargo's NorthStar account, and that he was there to upgrade her security system.  Vargo unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

51.     On or about July 1, 2017, NorthStar customer, Loreen Thomas, was approached at her home in Detroit, Michigan by a yet to be identified Alder sales representative.  The Alder representative told Thomas that he was a NorthStar employee and informed her that he needed to inspect her home security system in order to provide her with upgraded equipment.  Thomas later realized that the Alder representative was not a NorthStar employee and she received bills from two companies—NorthStar and Alder.  Thomas unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

52.     On or about July 1, 2017, NorthStar customer, Maxwell Hart, was approached at his home in Temple, Texas by a yet to be identified Alder sales representative.  The Alder representative told Hart that he was eligible for some additional equipment if she signed a letter that had previously been drafted by Alder to cancel her NorthStar account.  Hart, however, later received bills from two home security companies—Alder and NorthStar.  Hart unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

53.     On or about June 17, 2017, NorthStar customer, Joyce Wadlington, was approached at her home in Cleveland, Ohio by Alder sales representative Chris Pereyra.  Pereyra told Wadlington that he was a NorthStar employee and informed Wadlington that he had come to upgrade her home security system.  Wadlington later discovered that Pereya was not a NorthStar employee when she later received bills from two home security companies—NorthStar and Alder.  Wadlington unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

54.     On or about June 14, 2017, NorthStar customer, Vicki Valente, was approached at her home in Center Line, Michigan by a yet to be identified Alder sales representative.  The Alder representative told Valente that her account had been purchased by Alder and that they were installing new systems and lowering customers' rates.  The Alder representative told Valente that if she signed a letter that had been previously drafted by Alder, her account would be cancelled.  Valente later learned that these representations were untrue when she received bills from two home security companies—NorthStar and Alder.  Valente unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

55.     On or about June 14, 2017, NorthStar customer, Martha Chandler, was approached at her home in Temple, Texas by Alder sales representative Kyle Sockett.  Sockett told Chandler that her account had been purchased by Alder and that she was getting a new security system.  Sockett told Chandler to sign a letter that had been previously drafted by Alder and the account would be cancelled.  Chandler later learned that these representations were untrue when she received bills from two home security companies—NorthStar and Alder.  Chandler unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

56.     On or about June 22, 2017, NorthStar customer, Sherrie Chrysler, was approached at her home in Detroit, Michigan by Alder sales representative Justin Garner.  Garner told Chrysler that her home security system needed to be updated and she needed to sign a letter that had been previously drafted by Alder to cancel her account.  Chrysler unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

57.     On or about June 17, 2017, NorthStar customer, Michelle Sawoscinski, was approached at her home in Wayne, Michigan by Alder sales representative Justin Garner.  Garner told Sawoscinski he was from NorthStar and informed Chrysler that her security system was eligible for an "upgrade."  Garner told Sawoscinski to sign a letter that had previously been drafted by Alder to cancel her account and they would upgrade her system.  Sawoscinski later learned that Garner was not, in fact, a NorthStar employee, when she received bills from two companies—NorthStar and Alder.  Sawoscinski unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

58.     On or about June 9, 2017, NorthStar customer, Michael Bruner, was approached at his home in Spring, Texas by a yet to be identified Alder sales representative.  The Alder representative told Bruner that he was from NorthStar and informed Bruner that his security system needed to be upgraded.  Bruner did not know that the Alder representative was not with NorthStar until he received bills from two home security companies—NorthStar and Alder. Bruner unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

59.     On or about July 9, 2017, NorthStar customer, Jill Allen, was approached at her home in Ypsilanti, Michigan by a yet to be identified Alder sales representative.  The Alder representative told Allen he was from NorthStar and informed Allen that her security system needed to be upgraded.  Believing the representative was from NorthStar, Allen allowed the Alder representative into her home to install the updates to her system.  Allen unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

60.     On or about March 25, 2017, NorthStar customer, Regina Nichols, was approached at her home in St. Louis, Missouri by a yet to be identified Alder sales representative.  The Alder representative told Nichols that NorthStar had recently changed their name to Alder and that Nichols needed to sign something verifying her information.  Nichols discovered later that she was being billed two home security companies—Northstar and Alder. Nichols unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

61.     On or about August 9, 2016, NorthStar customer, Richard Jennings, was approached at his home in Columbia, South Carolina by Alder sales representative Jacob Dahl. Dahl told Jennings that NorthStar had recently merged with Alder and that his home security system panel needed to be updated as a result.  Jennings unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

62.     On or about August 9, 2016, NorthStar customer, Ashton Hall, was approached at his home in Columbia, South Carolina by a yet to be identified Alder sales representative.  The Alder sales representative told Hall that Alder was taking over Hall's account from NorthStar and was completing some upgrades to Hall's current system.  Hall unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

63.     On or about June 1, 2016, NorthStar customer, Frank Norville, was approached at his home in Columbia, South Carolina by a yet to be identified Alder sales representative.  The Alder sales representative told Norville that Alder was taking over Norville's account from NorthStar and was completing some upgrades to Hall's current system.  Hall unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

64.     On or about May 26, 2017, NorthStar customer, Ora Ryan, was approached at her home in Tuscaloosa, Alabama by a yet to be identified Alder sales representative.  The Alder sales representative told Ryan that he needed to install a newer "upgraded" security system. Ryan is 88-years-old and did not realize that the Alder representative was not with NorthStar. Ryan unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

65.     On or about May 23, 2017, NorthStar customer, Nancy Walsh, was approached at her home in Florissant, Missouri by Alder sales representative Jonathan Thomas.  Thomas told Walsh that Alder was taking over all local NorthStar accounts and completing some new upgrades as part of that change.  Walsh unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

66.     On or about May 23, 2017, NorthStar customer, Maria Mendoza, was approached at her home in Duncanville, Texas by a yet to be identified Alder sales representative.  The Alder representative told Mendoza that her system required some upgrades and that he would send in the correct paperwork to confirm the cancellation.  Alder did not, however, cancel Mendoza's NorthStar account.  Mendoza unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

67.     On or about February 1, 2017, NorthStar customer, Donald Shobe, was approached at his home in Oklahoma City, Oklahoma by a yet to be identified Alder sales representative.  The Alder representative led Shobe to believe he was with NorthStar and told Shobe that something was wrong with his security system and that it needed to be updated.  Shobe unintentionally signed up with a second home security company, Alder, based on the fraudulent misrepresentations.

68.     On or about November 2, 2016, NorthStar customer, Pattie Bohannon, was approached at her home in Northport, Alabama by a yet to be identified Alder sales representative.  The Alder representative led Bohannon to believe he was with NorthStar and told Bohannon that something was wrong with her security system and that it needed to be updated.  Bohannon did not realize that the Alder representative was not, in fact, with NorthStar

until she received bills from two home security companies—NorthStar and Alder.  Bohannon

unintentionally signed up with a second home security company, Alder, based on the fraudulent

misrepresentations.

69.     On or around June 25, 2017, NorthStar customer, Henry Hopkins, was

approached at his home in Tuscaloosa, Alabama by a yet to be identified Alder sales

representative.   The Alder representative told Hopkins that if he signed a new contract with

Alder, Alder would cancel Hopkins' existing contract with NorthStar.  Alder, however, never

cancelled Hopkins' contract with NorthStar.  Hopkins agreed to sign a new contract with Alder

based on the fraudulent misrepresentations.

70.     On or around August 10, 2017, NorthStar customer, William Murphy, was

approached at his home in Redford, Michigan by a yet to be identified Alder sales representative.

The Alder representative told Murphy that Alder had purchased the remainder of Murphy's

agreement with NorthStar.  Alder, however, had not purchased Murphy's NorthStar agreement,

nor had it cancelled his contract with NorthStar.  Murphy agreed to sign a new contract with

Alder based on the fraudulent misrepresentations.

71.     On or around July 30, 2017, NorthStar customer, Thomas Wright, was

approached at his home in Detroit, Michigan by a yet to be identified Alder sales representative.

The Alder representative told Wright that he was a NorthStar employee and installed some

"upgraded" equipment on Wright's home.  Wright later learned that the Alder representative was

not, in fact, associated with NorthStar when Wright called NorthStar for assistance on his

account.  Wright agreed to sign a new contract with Alder based on the fraudulent

misrepresentations.

72.     On or around June 23, 2017, NorthStar customer, Christine Brookins, was approached at her home in Saginaw, Michigan by a yet to be identified Alder sales representative.   The Alder representative told Brookins that he was a NorthStar employee and informed her that her home security system needed to be upgraded.  The Alder representative was not associated with Northstar.  Brookins agreed to sign a new contract with Alder based on the fraudulent misrepresentations.

## <u>FIRST CAUSE OF ACTION</u>
**(Violation of the Lanham Act, 15 U.S.C. § 1125 *et seq.*)**

73.     NorthStar incorporates the preceding allegations contained in the foregoing paragraphs as if fully set forth herein.

74.     In an effort to market and promote its own products and services, Defendant has made false and misleading statements about NorthStar and NorthStar's business as shown by, among other things, the false and misleading statements made by its sales representatives including those set forth herein.

75.     Defendant's false and misleading statements deceived, or had a tendency to deceive, a significant number of NorthStar's customers as to whether NorthStar is affiliated with Defendant.

76.     These statements were false and misleading statements that led to the confusion or mistake of NorthStar customers as to the origin, sponsorship, or approval of Defendant's goods and services in violation of 15 U.S.C. § 1125(a)(1)(A).

77.     These statements have confused, and will continue to confuse, NorthStar customers regarding the nature, origin, approval, sponsorship, or qualities of Defendant's goods and services in violation of 15 U.S.C. § 1125(a)(1)(B).

78.     Defendant's deceptive statements were and are material in that they lured, and are likely to continue luring in the future, NorthStar customers to purchase Defendant's products and services.

79.     At all relevant times herein, Defendant was engaged in a commercial activity, selling security systems to consumers.

80.     Defendant caused its fraudulent misconduct to enter interstate commerce.

81.     Defendant has injured NorthStar through its false representations either by a direct diversion of sales from NorthStar to Defendant or by a diminishing of the goodwill associated with NorthStar's goods and services.

82.     Defendant's misconduct will continue to injure NorthStar unless Defendant is restrained and enjoined.

83.     As a direct and proximate result of Defendant's unfair competition and deceptive practices, NorthStar has suffered and will continue to suffer monetary damages and irreparable harm.

84.     As a result, the Court should enter judgment in favor of NorthStar and award NorthStar injunctive relief, damages, Defendant's profits, NorthStar's attorney fees and costs, and treble damages pursuant to 15 U.S.C. § 1117(a).

85.     Additionally, this Court should award NorthStar punitive damages because Defendant's actions toward NorthStar were willful and malicious, or done with reckless indifference toward, and a disregard of, NorthStar's rights and the rights of others (such as causing existing NorthStar customers to be double billed by two separate security companies).

## SECOND CAUSE OF ACTION
### (Unfair Competition – Utah Common Law)

86.     NorthStar incorporates the preceding allegations contained in the foregoing paragraphs as if fully set forth herein.

87.     Defendant's deceptive sales tactics aimed at NorthStar as alleged above were for the purpose of passing off, palming off, imitating or substituting Alder's alarm systems and monitoring services for those of NorthStar.

88.     Defendant's deceptive sales tactics aimed at NorthStar as alleged above caused confusion and induced NorthStar customers to enter into contractual arrangements with Alder for alarm services, thinking that the alarm services were being provided by NorthStar.

89.     Defendant's actions towards NorthStar and its customers constitutes unfair competition under Utah common law because those actions caused confusion or were likely to cause confusion in the minds of a substantial number of NorthStar customers.

90.     Defendant's tortious misconduct has caused and continues to cause NorthStar monetary losses and other damages or injury in an amount to be determined at trial.

91.     Defendant's actions were done knowingly, willfully, with actual malice, and in bad faith (such as by causing existing NorthStar customers to be double billed by two separate security companies), so as to justify the assessment of increased, exemplary, and punitive damages against Defendant in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Commercial Disparagement)

92.     NorthStar incorporates the preceding allegations contained in the foregoing paragraphs as if fully set forth herein.

93.     Defendant knowingly disparaged and published false and/or deceptive statements regarding NorthStar, its business operations, its products and services, and/or its contractual relationships with its customers to others, including NorthStar's customers.  Such false statements include, but are not limited to, statements that NorthStar was no longer in business, that NorthStar's accounts were being taken over by Defendant, that the customer's NorthStar security system was not operational or did not operate properly, and/or that the customer's contract with NorthStar had ended or was unenforceable.

94.     These false and/or deceptive statements by Defendant have been harmful to NorthStar's interests because of the damage done to NorthStar's goodwill, customer relationships, potential customer relationships, dealer relationships, and its reputation in the market.

95.     NorthStar has lost numerous customers because of Defendant's false statements.

96.     Defendant made the false and/or deceptive statements regarding NorthStar with the intent that its false and/or deceptive statements would cause harm to NorthStar's interests (including without limitation its commercial and pecuniary interests), or else Defendant recognized or should have recognized that its false and/or deceptive statements regarding NorthStar were likely to do so.

97.     Defendant knew that the false and/or deceptive statements regarding NorthStar were false, or else Defendant acted with reckless disregard of the statements' truth or falsity.

98.     Defendant's false and/or deceptive statements regarding NorthStar were made with malice and have harmed NorthStar.

99.     As a direct and proximate result of Defendant's knowingly false and/or deceptive statements, NorthStar has suffered damages in an amount to be proven at the trial of this matter.

100.     Defendant's false and/or deceptive statements were the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of NorthStar and others (such as by causing existing NorthStar customers to be double billed by two separate security companies).  An award of punitive damages under Utah Code § 78B-8-201 is therefore justified.

101.     NorthStar is entitled to relief as set forth below in its Prayer for Relief.

## FOURTH CAUSE OF ACTION
### (Intentional Interference with NorthStar's Existing and Prospective Economic Relations)

102.     NorthStar incorporates the preceding allegations contained in the foregoing paragraphs as if fully set forth herein.

103.     NorthStar has existing and prospective economic relations with its customers, and NorthStar has prospective economic relations with its current and prospective customers because of its goodwill and ongoing marketing.

104.     Defendant knew of the existence of NorthStar's existing and prospective economic relations and intended to interfere with and disrupt those relations without justification and by an improper means.

105.     Defendant intentionally interfered with NorthStar's contractual relationship with its customers by either disrupting performance or making performance more expensive or difficult.

106.     Defendant's intentional interference with NorthStar's existing and prospective economic relations was undertaken using improper means including, without limitation,

25

engaging in deceptive trade practices, violating the Lanham Act, engaging in unfair competition, committing the tort of injurious falsehood, and otherwise making false, misleading, and deceptive statements to NorthStar's customers in violation of statutory, regulatory, and common law prohibitions.

107.    Defendant's intentional interference directly caused NorthStar customers to cancel service, refuse renewal, and/or in some cases default on payments due under their contracts.

108.    As a result, NorthStar has suffered damages in an amount to be determined at trial.

109.    Defendant's actions toward NorthStar and its customers were the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of NorthStar and others (such as by causing existing NorthStar customers to be double billed by two separate security companies). An award of punitive damages under Utah Code § 78B-8-201 is therefore justified.

## PRAYER FOR RELIEF

WHEREFORE, NorthStar prays for judgment and relief against Defendant as follows:

A.    On NorthStar's First Cause of Action, asserting violations of the Lanham Act against Defendant, for NorthStar's general, special, compensatory, actual, and/or statutory damages, plus attorney fees, costs, and treble damages, in an amount to be determined at trial.

B.    On NorthStar's Second Cause of Action, asserting a claim of unfair competition against Defendant, for NorthStar's general, special, compensatory, and actual damages, plus attorney fees, costs, and punitive damages in an amount to be determined at trial.

C.      On NorthStar's Third Cause of Action, asserting a claim of commercial disparagement against Defendant, for NorthStar's general, special, compensatory, and actual damages, plus attorney fees, costs, and punitive damages in an amount to be determined at trial.

D.      On NorthStar's Fourth Cause of Action, asserting a claim of intentional interference with existing and prospective economic relations against Defendant, for NorthStar's general, special, compensatory, and actual damages, plus attorney fees, costs, and punitive damages in an amount to be determined at trial.

E.      For NorthStar's attorney fees and costs as provided by law.

F.      For an award of pre-and post-judgment interest as provided by law.

G.      For punitive damages as permitted by law.

H.      For preliminary and permanent injunctive relief prohibiting Defendant from engaging in the deceptive and wrongful conduct and the abuse of process set forth herein.

I.      For such other and further relief as the Court deems just, proper and equitable under the circumstances.

## JURY DEMAND

NorthStar hereby demands a trial by jury on all issues raised herein so triable.

DATED this 19th day of December, 2017.

RAY QUINNEY & NEBEKER P.C.


/s/ Z. Ryan Pahnke
Matthew N. Evans
Eric G. Benson
Z. Ryan Pahnke
*Attorneys for Plaintiff*
*NorthStar Alarm Services, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of December, 2017, I caused the foregoing Amended Complaint to be filed electronically with the Court, which provided electronic notice to counsel of record in this matter.

*/s/ Z. Ryan Pahnke*

1438046